# UNITED STATES DISTRICT COURT

# MIDDLE DISTRICT OF LOUISIANA

**ESTELLE PULLEN**

**VERSUS**

**CIVIL ACTION**

**NO. 25-52-JWD-EWD**

**ST. GABRIEL HEALTH CLINIC INC.**

## RULING AND ORDER

This matter comes before the Court on the *Rule 12 Motion to Strike Allegations and Dismiss Claims* (Doc. 11) filed by defendant St. Gabriel Health Clinic, Inc. ("Defendant" or "St. Gabriel"). Plaintiff Estelle Pullen ("Plaintiff" or "Pullen") opposes the motions. (Doc. 15.) Defendant filed a reply. (Doc. 18.) Oral argument is not necessary. The Court has carefully considered the law, the facts in the record, and the arguments and submissions of the parties and is prepared to rule. For the following reasons, the *Motion to Strike* is denied, and the *Motion to Dismiss* is granted in part and denied in part.

## I.    RELEVANT FACTUAL AND PROCEDURAL BACKGROUND

### A.  The Complaint

#### 1.  *Plaintiff's Allegations*

This action was brought by Pullen against St. Gabriel for alleged violations of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* ("Title VII"), 42 U.S.C. § 1981, 41 U.S.C. § 4712, and Louisiana Revised Statutes 23:301 *et seq.* (*Complaint for Damages and Demand for Trial by Jury* ("*Complaint*"), Doc. 1.) Plaintiff claims that on the date of this lawsuit's filing, 210 days had passed since she lodged a whistleblower complaint with the Office of Inspector General ("OIG") for the U.S. Department of Health and Human Services ("HHS"). (Doc. 1 at ¶ 4.)

1

On October 17, 2016, Pullen began her relationship with St. Gabriel as a student intern while she was pursuing her master's degree. (*Id.* at ¶ 9.) St. Gabriel is a nonprofit corporation that receives federal funds for the operation of its health clinic. (*Id.* at ¶ 8.) St. Gabriel hired Pullen as an intern project manager in 2018, and she was promoted to Chief Operating Officer ("COO") in 2020. (*Id.* at ¶ 9.) St. Gabriel's Board of Directors ("the Board") appointed Pullen to the position of Interim Chief Executive Officer ("CEO") on March 1, 2023. (*Id.*)

Beginning when Pullen joined St. Gabriel as an intern in 2016, she was supervised by then-CEO Victor Kirk. (*Id.* at ¶ 10.) Mr. Kirk remained Pullen's supervisor until he stepped down as CEO in 2017, when the Board appointed Ms. Shirley Wade as his replacement. (*Id.* at ¶ 11.) At that time, Mr. Kirk joined the Board and continued to work at St. Gabriel as Director of Development. (*Id.* at ¶ 10.) St. Gabriel allowed Mr. Kirk to continue working for it while he was on the Board, which violated St. Gabriel's policies, and after he was indicted for fraud. (*Id.*) Pullen alleges she was instrumental in supporting the termination of Mr. Kirk's association with St. Gabriel due to the policy violation and the fraud allegations. (*Id.*)

From 2017 until 2023, CEO Ms. Wade supervised Pullen directly and gave Pullen positive performance reviews. (*Id.* at ¶¶ 11, 13.) During this period, the relationship between the CEO's office and the Board "began fracturing and contentious Board meetings became the norm." (*Id.* at ¶ 12.)

In March 2023, the Board did not renew Ms. Wade's employment as CEO. (*Id.* at ¶ 14.) Plaintiff, Ms. Wade, and the staff were not informed about this nonrenewal. (*Id.* at ¶ 15.) Additionally, the Board did not announce that the CEO position was available or that the Board later filled the position. (*Id.*) Pullen was named as interim CEO. (*Id.* at ¶ 14.) On March 14, 2023,

Charles Williams was the only applicant interviewed for the CEO position, and the Board approved hiring him by majority vote. (*Id.* at ¶ 15.)

As interim CEO, Pullen submitted a complaint of abuse and waste to HHS on March 17, 2023. (*Id.* at ¶ 16.) This complaint alleged that the Board's removal of Ms. Wade was done to misuse St. Gabriel's funds and that "an investigation was needed to uncover the acts of a 'rogue' Board." (*Id.*) On March 20, 2023, Pullen submitted the same complaint to HHS's OIG. (*Id.* at ¶ 17.) The OIG complaint named several Board members and the newly hired CEO Mr. Williams. (*Id.*) Pullen believed the complaint was confidential. (*Id.* at ¶ 20.)

On April 18, 2023, Mr. Williams confronted Pullen "over some issues he had with whether he was listed on a document as Chief Executive Officer." (*Id.* at ¶ 18.) Mr. Williams engaged Pullen in a "verbal altercation and criticized the manner in which she spoke, highlighting her accent and mannerisms." (*Id.*) Pullen is originally from Africa and speaks with an accent. (*Id.* at ¶¶ 31, 18.) During their confrontation, Mr. Williams told Pullen not to talk to him "that way," and Pullen responded, "this is my voice." (*Id.* at ¶ 18.) Later that day, Pullen submitted a written complaint of retaliation to the Board regarding Mr. Williams's "harassment" and claiming she felt threatened by him. (*Id.* at ¶ 19.)

On April 26, 2023, Pullen and the Board's personnel committee had a meeting in which one Board member discussed how Pullen expressed herself. (*Id.* at ¶ 22.) Eva Anderson, the quality assurance manager, "suggested that there were many cultures that were employed at St. Gabriel which needed to be recognized." (*Id.*) Ms. Bess, a Board member, stated that Pullen's manner of speaking was "hollaring" and that Pullen did not realize how she came across. (*Id.*) Ms. Bess also kept asking Pullen what she was trying to say, referring to Pullen's accent. (*Id.*)

Mr. Williams again approached Plaintiff on April 28, 2023, this time with an HR representative. (*Id.* at ¶ 20.) Mr. Williams claimed he was meeting with Pullen to document the "verbal warning" he allegedly gave her during their April 18 encounter. (*Id.*) Plaintiff refused to sign the documentation because Mr. Williams did not give her a verbal warning on April 18. (*Id.*) Mr. Williams informed Pullen that he knew she had filed a grievance against him for alleged retaliation based on her OIG complaint. (*Id.*) Mr. Williams "adamantly questioned" Pullen about the complaint and tried to force Pullen to answer detailed questions about it. (*Id.*) Mr. Williams also showed Pullen a copy of a business card for an OIG special agent. (*Id.*)

Pullen sought assistance from the Board, the quality assurance manager Ms. Anderson, and Kellie Taylor from human resources. (*Id.* at ¶ 21.) Ms. Anderson recommended omitting the verbal warning from Pullen's personnel file and ordering cultural sensitivity, cultural differences, workplace violence, and culture of safety courses. (*Id.*) Mr. Williams disagreed with these recommendations. (*Id.*)

On May 3, 2023, the Board found that neither Pullen nor Mr. Williams should be reprimanded; that the verbal warning should be omitted from Pullen's file; and that the entire staff take courses on life training, handling conflict in the workplace, and cultural diversity. (*Id.* at ¶ 23.) Mr. Williams again voiced his disagreement with this plan. (*Id.*)

At some point in May 2023, Mr. Williams was put on leave due to a background check issue. (*Id.* at ¶ 24.) Two sexual harassment complaints against Mr. Williams were submitted by other co-workers. (*Id.*) Pullen saw an advertisement for the CEO position on the internet on May 24, 2023, and she applied for the position. (*Id.* at ¶ 25.) The Board chose to re-hire Mr. Williams as CEO in June 2023 instead of hiring Pullen. (*Id.* at ¶ 26.)

Pullen submitted a police report on June 16, 2023, against Ms. Taylor due to a road rage incident that happened outside of work. (*Id.* at ¶ 27.) Ms. Taylor then submitted a complaint against Pullen at work. (*Id.* at ¶ 28.) During a subsequent interview with the Boad regarding the incident with Ms. Taylor, the Board president told Pullen she needed to "'adhere to the culture' when she came to America." (*Id.* at ¶ 28.) Before the meeting, a member of the Board said "at least you speak English without accent" when addressing "the new Hispanic board member." (*Id.*)

On August 30, 2023, another co-worker submitted a sexual harassment complaint against Mr. Williams. (*Id.* at ¶ 29.) "During this time, [Pullen] had applied for the CEO position and for the Project Manager position." (*Id.* at ¶ 30.) The Board's personnel committee assembled on September 22, 2023, to review Pullen's complaints against Mr. Williams and her allegations of a hostile work environment. (*Id.* at ¶ 31.) Board members made statements such as, "I have worked with people from Africa and [all] over the world and no[ne] act like that"; Pullen "always want[s] to blame it on her culture"; "When you assimilate to another country you assume that countr[y's] culture"; when they speak to Pullen "one on one in the office her speech is clear and not so thick that you can't understand her"; and "This is part of her job." (*Id.*)

On March 1, 2024, Plaintiff submitted a complaint to the Equal Employment Opportunity Commission ("EEOC") "for national origin harassment, retaliation and sex." (*Id.* at ¶ 33.) Plaintiff submitted a complaint to the Health Resources and Services Administration ("HRSA") on April 24, 2024, in which she claimed she was not hired as the new project director "because she was told she had an accent." (*Id.* at ¶ 34.) In addition, during a Board meeting regarding hiring the next CEO, Board members stated they would not make Pullen CEO "because of her accent." (*Id.*)

The Board informed Pullen, while she was on leave on September 13, 2024, that she "would be demoted to COO" and that her salary would decrease from $90,000 per year to $71,000.

(*Id.* at ¶ 35.) Pullen received no explanation for the "demotion." (*Id.*) Pullen's work email was also suspended without her knowledge. (*Id.*) Pullen alleges that Mr. Williams influenced the demotion and Pullen being "passed over" for the CEO position. (*Id.* at ¶ 49.) The EEOC issued a Determination and Notice of Rights to Plaintiff on November 4, 2024. (Doc. 1-2.) When Pullen returned from leave on November 7, 2024, she "was forced to resign" "due to this demotion." (Doc. 1 at ¶ 37.) During a November 7 meeting with the Board, the Board questioned Pullen "about various topics" and had her escorted out by the police. (*Id.*)

### 2. *Plaintiff's Four Counts, Jury Demand, and Prayer*

The *Complaint* contains four counts. Under Count One, Pullen makes an unlawful discriminatory employment practice claim against St. Gabriel. (*Id.* at ¶ 39.) Pullen claims the alleged unlawful discrimination is based on her national origin. (*Id.*) She alleges she was not hired as CEO due to St. Gabriel's discriminatory acts and that she "has suffered and will continue to suffer monetary damages and damages for mental anguish and humiliation." (*Id.* at ¶ 40.) Pullen also claims she is under a physician's care and has been diagnosed with anxiety and depression due to this incident. (*Id.* at ¶ 41.)

Under Count Two, Pullen makes a claim under 42 U.S.C. § 1981. (*Id.* at ¶ 43.) Pullen specifically alleges that due to her accent, she was not hired as CEO and was demoted to a lower pay range. (*Id.* at ¶ 44.) Plaintiff claims she has suffered and will continue to suffer monetary damages and damages for violations of § 1981. (*Id.*)

Under Count Three, Pullen makes a whistleblower claim under 41 U.S.C. § 4712. (*Id.* at ¶ 45.) Pullen asserts that St. Gabriel is an entity receiving federal funding and that it employed Pullen. (*Id.* at ¶ 46.) Pullen alleges she engaged in protective activity by submitting an OIG complaint about the Board's alleged abuse and misuse of funds. (*Id.* at ¶ 47.) Plaintiff continues

that St. Gabriel "knew and was reasonably on notice that the Plaintiff engaged in protected activity," as shown by Mr. Williams's demand to know about the OIG complaint and showing Pullen a copy of the special agent's business card. (*Id.* at ¶ 48.) Plaintiff alleges Mr. Williams influenced her demotion and her being passed over for the CEO position because he was concerned about the OIG complaint. (*Id.* at ¶ 49.) Plaintiff also asserts there is "a temporal and factual causal connection between" the OIG complaint and Pullen being passed over for the CEO position. (*Id.* at ¶ 50.)

Under Count Four, Pullen claims Title VII's caps on compensatory and punitive damages apply because St. Gabriel has more than 100 employees. (*Id.* at ¶ 52.) Pullen alleges that any back pay and front pay awarded under § 1981 are not treated as compensatory damages, and thus, the damages cap does not apply to them. (*Id.* at ¶ 53.) Pullen asserts that her damages "clearly exceed $300,000 for compensatory and punitive damages." (*Id.* at ¶ 54.) Pullen claims her damages include humiliation, pain and suffering, and mental anguish. (*Id.*) She also alleges she has suffered from depression and anxiety. (*Id.*)

### B. Procedural Background

Plaintiff submitted a complaint to HHS and the OIG on March 17, 2023, and March 20, 2023, respectively, regarding Defendant's reasons for removing of Ms. Wade from the CEO position. (Doc. 1 at ¶¶ 16–17.) On March 1, 2024, Plaintiff submitted a complaint to the EEOC "for national origin harassment, retaliation and sex." (*Id.* at ¶ 33.) Plaintiff also filed a complaint with the HRSA on April 24, 2024, in which she alleged she was passed over for a position due to her accent. (*Id.* at ¶ 34.) Plaintiff further alleges she lodged a whistleblower complaint with the OIG for HHS. (*Id.* at ¶ 4.) The EEOC issued a Determination and Notice of Rights to Plaintiff on November 4, 2024. (Doc. 1-2.)

This lawsuit was filed on January 15, 2025, (Doc. 1) which Plaintiff alleges was over 210 days after she lodged her whistleblower complaint. (*Id.* at ¶ 4.) Defendant now moves to strike and dismiss portions of the *Complaint* on April 7, 2025. (Doc. 11.)

## II.    MOTION TO STRIKE

### A.  Legal Standard

Federal Rule of Civil Procedure 12(f) provides in relevant part: "The court may strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." Fed. R. Civ. P. 12(f). "The district court possesses considerable discretion in disposing of a Rule 12(f) motion to strike redundant, impertinent, immaterial, or scandalous matter." 5C Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1382 (3d ed. 2025); *see also United States v. Coney*, 689 F.3d 365, 379 (5th Cir. 2012) (noting that the Fifth Circuit "review[s] a district court's ruling on a motion to strike for abuse of discretion").

A party urging a motion to strike must meet certain requirements. "[M]otion[s] to strike should be granted only when the pleading to be stricken has no possible relation to the controversy." *Coney*, 689 F.3d at 379 (quoting *Augustus v. Bd. of Pub. Instruction of Escambia Cnty.*, 306 F.2d 862, 868 (5th Cir. 1962)); *see also Gilchrist v. Schlumberger Tech. Corp.*, 321 F.R.D. 300, 302 (W.D. Tex. 2017) (citing *Coney*, 689 F.3d at 379).

Further, the movant must show that the "presence [of the challenged allegations] in the pleading throughout the proceeding will be prejudicial." *F.D.I.C. v. Niblo*, 821 F. Supp. 441, 449 (N.D. Tex. 1993) (citing *Augustus*, 306 F.2d at 868). As Wright & Miller states:

> [T]here appears to be general judicial agreement, as reflected in the extensive case law on the subject, that [motions to strike] should be denied unless the challenged allegations have no possible relation or logical connection to the subject matter of the controversy and may cause some form of *significant* prejudice to one or more of the parties to the action.

Wright & Miller, *supra*, at § 1382 (emphasis added); *see also Niblo*, 821 F. Supp. at 449 (citing *Augustus*, 306 F.2d at 868); *Global Adr, Inc. v. City of Hammond*, No. 03-457, 2003 WL 21146696, at *1 (E.D. La. May 15, 2003) (citing *Niblo*, 821 F. Supp. at 449). *Cf. Frank v. Shell Oil Co.*, 828 F. Supp. 2d 835, 852 (E.D. La. 2011), *on reconsideration in part*, No. 11-871, 2012 WL 1230736 (E.D. La. Apr. 12, 2012) ("A motion to strike should be granted only when 'the allegations are prejudicial to the defendant or immaterial to the lawsuit.'") (quoting *Harris v. USA Ins. Companies*, No. 11-201, 2011 WL 3841869, at *1 (E.D. La. Aug. 30, 2011)). This standard is a "heavy burden," *Gilchrist*, 321 F.R.D. at 302, and a "high bar," *Global Adr, Inc.*, 2003 WL 21146696, at *1.

"[T]he action of striking a pleading should be sparingly used by the courts." *Coney*, 689 F.3d at 379 (quoting *Augustus*, 306 F.2d at 868). "[S]triking a portion of a pleading is a drastic remedy . . . ." *Niblo*, 821 F. Supp. at 449 (citing *Augustus*, 306 F.2d at 868). Consequently, "motions under Rule 12(f) are viewed with disfavor and are infrequently granted." *Niblo*, 821 F. Supp. at 449 (citing *Augustus*, 306 F.2d at 868). "Any doubt about whether the challenged material is redundant, immaterial, impertinent, or scandalous should be resolved in favor of the non-moving party." Wright & Miller, *supra*, at § 1382.

Looking at the specific grounds for striking, "'[i]mmaterial' matter is that which has no essential or important relationship to the claim for relief or the defenses being pleaded, or a statement of unnecessary particulars in connection with and descriptive of that which is material." Wright & Miller, *supra*, at § 1382. "Unnecessary jurisdictional allegations may be eliminated as immaterial as may averments of evidentiary facts." *Id.* "In addition, superfluous historical allegations also have been subject to a motion to strike, although allegations of this type may be permitted in a pleading if they are relevant to the claim for relief or provide useful background for the parties and the court in the absence of any prejudice." *Id.*

With respect to the procedural aspects of motions to strike, "[a] motion to strike must comply with the requirement in Rule 7(b) that motions state with particularity the grounds therefor and set forth the nature of relief or type of order sought." *Id.* at § 1380. "All well-pleaded facts are taken as admitted on a motion to strike but conclusions of law or conclusions drawn from the facts do not have to be treated in that fashion by the district judge." *Id.* "The district court also should refrain from becoming enmeshed in the merits of the action or the legal sufficiency of the pleadings, although this may be difficult to prevent when the relevance or materiality of the challenged allegations is in issue on the motion." *Id.* at § 1382. "If the court grants a motion to strike redundant, immaterial, impertinent, or scandalous material, its order should delineate the matter to be eliminated with some care so as to avoid the excision of unobjectionable allegations and to prevent unnecessary controversy over the scope of the order." *Id.* Thus, "[i]f the district court determines that certain references in a pleading are prejudicial, only those references and not the entire paragraphs containing them should be stricken." *Id.* at § 1380.

### B. Parties' Arguments

#### 1. Motion to Strike *(Doc. 11)*

Defendant first argues that Plaintiff's *Complaint* "contains immaterial, impertinent, and scandalous allegations and assertions which embellish the Complaint, are prejudicial to Defendant, and create spurious issues requiring time and money to litigate." (Doc. 11-1 at 3–4.) According to Defendant, paragraphs 10, 12, 14, and 29 in the *Complaint* "are wholly unrelated" to Plaintiff's claims of discrimination and were included in the *Complaint* "in an attempt to discredit [Defendant] and its employees and paint them in a bad light." (*Id.* at 4.) Defendant alleges that those paragraphs in no way relate to the elements of Plaintiff's discrimination claims, are irrelevant and improper, and should be stricken. (*Id.* at 4.)

### 2. Opposition *(Doc. 15)*

Plaintiff argues that the *Motion to Strike* fails to set forth any rationale explaining why paragraphs 10, 12, 24, and 29 do not relate to the elements of her discrimination claim. (Doc. 15 at 4–5.) Close examination of the disputed paragraphs reveals they are related to Plaintiff's discrimination claim and are material to the case. (*Id.* at 5.)

First, Plaintiff asserts that paragraph 10 indicates that she engaged in protected activities as early as 2016–2017, when she supported terminating St. Gabriel's former CEO Victor Kirk. (*Id.*) The assertions in paragraph 10 are relevant to her whistleblower claim under 41 U.S.C. § 4712 by allegedly showing Defendant's "systemic pattern" of tolerating misconduct by some employees and selectively enforcing policies against Plaintiff. (*Id.*)

Paragraph 10 alleges:

10. Between 2016- 2017 the first Chief Executive Officer to supervise Plaintiff was Victor Kirk who ultimately resigned in 2018 after being indicted for fraud against the Louisiana Medicaid Program by causing the false medical diagnoses of children. The Board of St. Gabriel allowed Mr. Kirk to join the Board even after being indicted and permitted him to continue to work at St. Gabriel as Director of Development until he was sentenced to prison. Participating in the St. Gabriel Board while working for St. Gabriel was a violation of St. Gabriel's policies and Ms. Pullen was instrumental in supporting the termination of Mr. Kirk due to the issues related to fraud and policy violations. Mr. Kirk pleaded guilty and was sentenced to prison in January, 2023.

(Doc. 1 at 3.) Plaintiff contends that paragraph 10's allegations regarding Mr. Kirk's continued employment with Defendant despite violations of internal policies supports a disparate treatment claim when contrasted with the reprisals Plaintiff received for later reporting similar misconduct. (Doc. 15 at 6.) Plaintiff alleges this differing treatment suggests that her alleged protected activity was a but-for cause of the retaliatory treatment she experienced. (*Id.*) Plaintiff asserts that courts recognize that evidence of an employer's different responses to comparable allegations can be

probative of discriminatory intent. (*Id.* (citing *Watkins v. Tregre*, 997 F.3d 275 (5th Cir. 2021).) Thus, Plaintiff concludes, the allegations in paragraph 10 are material to this case. (*Id.*)

Second, Plaintiff asserts that paragraph 12 is neither scandalous nor immaterial because it is her firsthand experience with Board meetings. (*Id.* at 7.) Paragraph 12 provides:

> 12. Throughout the time that Ms. Wade was the Chief Executive Officer, the relationship between the Board of St. Gabriel and the office of Chief Executive Officer began fracturing and contentious Board meetings became the norm.

(Doc. 1 at 3.) Plaintiff notes that paragraphs 22, 31, and 32 of the *Complaint* allege discriminatory statements about Plaintiff's national origin and accent were made at later Board meetings. (Doc. 15 at 7.) Plaintiff insists that describing the relationship between the Board and the CEO's office as "fracturing" was accurate. (*Id.*) Plaintiff further claims this paragraph is material to her Title VII harassment claim because it proves Plaintiff, while interim CEO, did not consent or agree to the harassing remarks about her national origin. (*Id.*)

Finally, Plaintiff argues that paragraphs 24 and 29, which involve other complaints against her alleged harasser Charles Williams, are necessary for a comparator evaluation for a prima facie discrimination case. (*Id.*) These paragraphs allege:

> 24. At some point in May, 2023, Mr. Williams was put on leave due to a background check issue. Two complaints were submitted by other co-workers against Mr. Williams for sexual harassment.

> 29. On August 30, 2023 a complaint was submitted by another co-worker against Mr. Williams for sexual harassment.

(Doc. 1 at 6, 7.) "[A] plaintiff may establish prima facie disparate treatment by showing he was treated less favorably than a similarly situated comparator." (Doc. 15 at 7–8 (citing *Lee v. Kansas City S. Ry. Co.*, 574 F.3d 253, 259–61 (5th Cir. 2009).) Plaintiff alleges that on the one hand, Mr. Williams was rehired as CEO and promoted despite being under investigation for sexual harassment and disciplinary complaints. (*Id.* at 8.) Plaintiff, on the other hand, was demoted from

the interim CEO position and ultimately resigned after engaging in allegedly protected activity.
(*Id.*)

### 3.  Reply (Doc. 18)

Defendant argues that Plaintiff fails to address "several critical points" that warrant the granting of Defendant's *Motion*. (Doc. 18 at 1.) First, paragraphs 10 and 12 contain allegations regarding events that occurred before the alleged harassment and discrimination began on March 1, 2023. (*Id.* at 1–2.) Defendant contends that those allegations serve only to portray Defendant in a negative light and are immaterial to the claims at issue in this case. (*Id.* at 2.) Second, Defendant claims paragraphs 24 and 29 "reference sexual harassment allegations made by other employees, not by Plaintiff herself, and concern alleged conduct by Mr. Williams while he was St. Gabriel's Chief Executive Officer." (*Id.*) Defendant concludes the allegations in those paragraphs "are clearly intended to inflame and prejudice rather than support" Plaintiff's prima facie case. (*Id.*)

### C.  Law and Analysis

"[M]otion[s] to strike should be granted only when the pleading to be stricken has no possible relation to the controversy." *Coney*, 689 F.3d at 379 (quoting *Augustus*, 306 F.2d at 868). Defendant has not shown that paragraphs 10, 12, 24, and 29 in the *Complaint* have no relation to the controversy, and indeed, the Court finds that they are related. Specifically, paragraph 10 provides an example of how high-ranking employees other than Plaintiff were treated when their professional conduct was called into question. Additionally, paragraphs 24 and 29 supplement other allegations of Mr. Williams's alleged misconduct to show, if true, that Defendant overlooked such conduct for other high-level employees but treated Plaintiff negatively due to complaints regarding the way she speaks and her filing of a complaint with the OIG. Thus, paragraphs 10, 24, and 29 are related to the controversy. Finally, paragraph 12 is background information that informs

that state of the relationship between the Board and the CEO's office when Plaintiff became interim CEO. Plaintiff complains of negative treatment she received from Board members after being named interim CEO, so paragraph 12 relates to the controversy.

Further, Defendant has not established that it would be prejudiced by allowing these paragraphs. Defendant simply states that the factual allegations in these paragraphs are wholly unrelated to Plaintiff's claims and were included in an attempt to discredit Defendant and paint it in a bad light. (Doc. 11-1 at 4.) Defendant gives no further argument as to how or why the allegations will prejudice it. As the Court has already explained, the allegations in paragraphs 10, 12, 24, and 29 are related to the controversy. Defendant has failed to meet its burden, and therefore, the *Motion to Strike* will be denied.

### III.   MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM

#### A.   Rule 12(b)(6) Standard

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Hamilton v. Dallas Cnty*., 79 F.4th 494, 499 (5th Cir. 2023) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007))). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (quoting *Iqbal*, 556 U.S. at 678).

"To be plausible, the complaint's '[f]actual allegations must be enough to raise a right to relief above the speculative level.'" *In re Great Lakes Dredge & Dock Co. LLC*, 624 F.3d 201, 210 (5th Cir. 2010) (quoting *Twombly*, 550 U.S. at 555). "In deciding whether the complaint states a valid claim for relief, we accept all well-pleaded facts as true and construe the complaint in the light most favorable to the plaintiff." *Id.* (citing *Doe v. MySpace, Inc.*, 528 F.3d 413, 418 (5th Cir.

2008)). The Court does "not accept as true 'conclusory allegations, unwarranted factual inferences, or legal conclusions.'" *Id.* (quoting *Ferrer v. Chevron Corp.*, 484 F.3d 776, 780 (5th Cir. 2007)). "A claim for relief is implausible on its face when 'the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct.'" *Harold H. Huggins Realty, Inc. v. FNC, Inc.*, 634 F.3d 787, 796 (5th Cir. 2011) (citing *Iqbal*, 556 U.S. at 679).

The Court's "task, then, is 'to determine whether the plaintiff has stated a legally cognizable claim that is plausible, not to evaluate the plaintiff's likelihood of success.'" *Doe ex rel. Magee v. Covington Cnty. Sch. Dist. ex rel. Keys*, 675 F.3d 849, 854 (5th Cir. 2012) (quoting *Lone Star Fund V (U.S.), L.P. v. Barclays Bank PLC*, 594 F.3d 383, 387 (5th Cir. 2010) (citing *Iqbal*, 556 U.S. at 678)). "[A] claim is plausible if it is supported by 'enough fact[s] to raise a reasonable expectation that discovery will reveal evidence of [the alleged misconduct].'" *Calhoun v. City of Hou. Police Dep't*, 855 F. App'x 917, 919–20 (5th Cir. 2021) (per curiam) (quoting *Twombly*, 550 U.S. at 556).

Additionally, "[i]n determining whether a plaintiff's claims survive a Rule 12(b)(6) motion to dismiss, the factual information to which the court addresses its inquiry is limited to (1) the facts set forth in the complaint, (2) documents attached to the complaint, and (3) matters of which judicial notice may be taken under Federal Rule of Evidence 201." *Inclusive Cmtys. Project, Inc. v. Lincoln Prop. Co.*, 920 F.3d 890, 900 (5th Cir. 2019) (citations omitted). "Although a 'court may also consider documents attached to either a motion to dismiss or an opposition to that motion when the documents are referred to in the pleadings and are central to a plaintiff's claims,' . . . the court need not do so." *Brackens v. Stericycle, Inc.*, 829 F. App'x 17, 23 (5th Cir. 2020) (per curiam) (quoting *Brand Coupon Network, L.L.C. v. Catalina Mktg. Corp.*, 748 F.3d 631, 635 (5th Cir. 2014)); *see also Dorsey v. Portfolio Equities, Inc.*, 540 F.3d 333, 338 (5th Cir. 2008) (using

permissive language regarding a court's ability to rely on "documents incorporated into the complaint by reference").

### B. Timeliness of Count One's Title VII Claims Arising Before May 6, 2023

#### 1. Parties' Arguments

##### a. Motion to Dismiss (Doc. 11)

Defendant claims Plaintiff filed her Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") on March 1, 2024. (Doc. 11-1 at 6.) Defendant alleges that such a charge, when filed in a deferral state like Louisiana, "must be filed within 300 days of the alleged unlawful employment practice." (*Id.* at 5 (citing 42 U.S.C. § 2000e-5(e)(1); *Janmeja v. Bd. Of Supervisors of La. State Univ.*, 96 F. App'x 212, 214 (5th Cir. 2004).) Defendant concludes that any alleged unlawful acts prior to May 6, 2023, fall outside Title VII's 300-day window and are time-barred. (*Id.* at 6) Specifically, Defendant states that the following allegations are untimely: (1) Plaintiff "was not allowed to apply for the CEO position in March 2023;" (2) Plaintiff "was verbally attacked by Mr. Williams on April 18, 2023;" and (3) Plaintiff "received a verbal warning by Mr. Williams on April 26, 2023." (*Id.*)

##### b. Opposition (Doc. 15)

Plaintiff argues that "a hostile work environment claim, like the Plaintiff's, is composed of a series of separate acts that collectively constitute one 'unlawful employment practice.'" (Doc. 15 at 8 (citing 42 U.S.C. § 2000e-5(e)(1); *National R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 117 (2002), *superseded in part by statute*, Lilly Ledbetter Fair Pay Act, Pub. L. No. 111-2, 123 Stat. 5 (2009)).) According to Plaintiff, Title VII's timely filing provision "only requires that a Title VII plaintiff file a charge within a certain number of days after the unlawful practice happened." (*Id.* at 9.) Plaintiff asserts that if an act contributing to the claim occurs within the filing period,

the entire time period of the hostile work environment, even component acts that fall outside the statutory period, may be considered by a court when determining liability. (*Id.* (citing *National R.R. Passenger Corp.*, 536 U.S. at 117).)

Plaintiff says she alleges a hostile work environment and national origin harassment in paragraph 56 of the *Complaint*, and therefore, all acts prior to May 6, 2023, may be considered. (*Id.*) Plaintiff claims the specific allegations Defendant pointed out as untimely "are material to the ongoing hostile work environment" that Plaintiff experienced. (*Id.* at 11.) Plaintiff insists she properly complained of acts giving rise to an ongoing hostile work environment in her March 1, 2024, EEOC charge, and therefore, the Court must consider any claims from 2023 forward. (*Id.*)

c. *Reply* (Doc. 18)

Defendant replies that Plaintiff's allegations regarding a series of "discriminatory employment practices" conflates discrimination and hostile work environment claims, which are "distinct and separate causes of action." (Doc. 18 at 2 (citing *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57 (1986)).) According to Defendant, the *Opposition*'s assertion that Plaintiff's claims "are 'actionably collectively' part of a hostile work environment" is an attempt to salvage the timeliness of Plaintiff's claims. (*Id.*) Defendant asserts that Plaintiff "does not, and cannot, establish that any claim of discrete discrimination based on conduct occurring prior to May 6, 2023, is timely." (*Id.*) Defendant argues that Plaintiff's allegations regarding conduct in March and April 2023 fall outside the actionable limitations period. (*Id.*) Defendant concludes, "To the extent Plaintiff characterizes these incidents as discrete acts of discrimination rather than part of a continuing hostile work environment, they are untimely and must be dismissed accordingly." (*Id.*)

### 2. *Applicable Law*

Under Title VII, a plaintiff must file a timely EEOC charge describing the unlawful employment action complained about before filing suit. 42 U.S.C. § 2000e–5(e)(1). The time-period applicable to determining whether the plaintiff filed a "timely" EEOC charge differs depending on the state in which it is filed. "Generally, Title VII's enforcement provisions require that an EEOC charge must be filed within 180 days after the alleged unlawful employment practice has occurred." *Fontenot v. Bd. of Supervisors of La. State Univ.*, No. 20-8, 2022 WL 2709006, at *7 (M.D. La. July 12, 2022) (Dick, C.J.) (citing 42 U.S.C. § 2000e–5(e)(1)). "However, in a 'deferral state,' such as Louisiana, a claimant has an extended, 300-day period to file an EEOC charge." *Id.* (citing *Conner v. Louisiana Dep't of Health & Hosps.*, 247 F. App'x 480, 481 (5th Cir. 2007)). For purposes of filing a timely charge under Title VII, "[a] discrete retaliatory or discriminatory act 'occurred' on the day that it 'happened.'" *Nat'l R.R. Passenger Corp*, 536 U.S. at 110.

This timing requirement is imposed on all Title VII claims regardless of "whether they are based on allegations of disparate treatment, disparate impact, hostile work environment, or retaliation[.]" *Clark v. City of Alexandria*, No. 20-01581, 2022 WL 822912, at *8 (W.D. La. Feb. 23, 2022), *report and recommendation adopted*, 2022 WL 816793 (W.D. La. Mar. 16, 2022). "Filing a timely charge is a prerequisite to having an actionable claim." *Santos v. Baton Rouge Water Works Co.*, No. 18-1098, 2021 WL 1227875, at *11 (M.D. La. Mar. 31, 2021) (deGravelles, J.) (quoting *Stewart v. Mississippi Transp. Comm'n*, 586 F.3d 321, 328 (5th Cir. 2009)). Consequently, "any claims arising more than 300 days prior to the filing of an EEOC charge are time-barred." *Id.* (citing 42 U.S.C. § 2000e–5(e)(1)).

"In hostile work environment claims, however, if one act alleged to have created the hostile environment is timely exhausted, a court may consider the entire scope of the hostile work environment claim." *Filer v. Donley*, 690 F.3d 643, 647 (5th Cir. 2012) (internal quotation marks omitted) (quoting *Stewart*, 586 F.3d at 328). However, there are three limitations on the continuing violation doctrine:

> First, the plaintiff must demonstrate that the "separate acts" are related, or else there is no single violation that encompasses the earlier acts. [*National R.R. Passenger Corp.*, 536 U.S.] at 118, 120, 122 S.Ct. 2061. Second, the violation must be continuing; intervening action by the employer, among other things, will sever the acts that preceded it from those subsequent to it, precluding liability for preceding acts outside the filing window. *Id.* at 118, 122 S.Ct. 2061. Third, the continuing violation doctrine is tempered by the court's equitable powers, which must be exercised to "honor Title VII's remedial purpose 'without negating the particular purpose of the filing requirement.' " *Id.* at 120, 122 S.Ct. 2061 (quoting *Zipes v. Trans World Airlines, Inc.*, 455 U.S. 385, 102 S.Ct. 1127, 71 L.Ed.2d 234).

*Stewart*, 586 F.3d at 328.

"A hostile work environment exists 'when the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" *Id.* (quoting *National R.R. Passenger Corp.*, 536 U.S. at 116). To determine whether a work environment is "hostile," a court considers "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Ramsey v. Henderson*, 286 F.3d 264, 268 (5th Cir. 2002) (quoting *Walker v. Thompson*, 214 F.3d 615, 625 (5th Cir. 2000), *overruled in part on other grounds by Burlington N. & Santa Fe. Ry. Co. v. White*, 548 U.S. 53, 67 (2006)).

Finally, this Court has previously explained:

> The Fifth Circuit ... [does] "not require that a Title VII plaintiff check a certain box or recite a specific incantation to exhaust his or her administrative remedies before the proper agency." Nor does it "require, for purposes of exhaustion, that a plaintiff

allege a prima facie case before the EEOC." "Instead, the plaintiff's administrative charge will be read somewhat broadly, in a fact-specific inquiry into what EEOC investigations it can reasonably be expected to trigger."

*Martin v. Winn–Dixie La., Inc.*, No. 3:13–CV–00682, 2015 WL 1281943, at *6 (M.D. La. Mar. 20, 2015) (deGravelles, J.) (citing *Jeavons v. Exxon Mobil Corp.*, No. 13–753, 2014 WL 897425, at *2 (M.D. La. Mar. 5, 2014)).

### 3.  *Analysis*

Plaintiff filed her EEOC charge on March 1, 2024. (Doc. 1 at ¶ 33.) Defendant correctly points out that 300 days prior to the charge's filing date is May 6, 2023. (Doc. 11-1 at 6.) Defendant is correct in that any discrimination or retaliation claims that arose more than 300 days before the filing of Plaintiff's EEOC charge are time-barred. Under Title VII, the employee must file an EEOC charge describing the actions made unlawful under Title VII within 300 days "after the alleged unlawful employment practice occurred." 42 U.S.C. § 2000e–5(e)(1). Therefore, any discrete discriminatory or retaliatory acts that occurred prior to May 6, 2023, are time-barred under Title VII.

In her *Opposition*, Plaintiff claims she properly complained of acts giving rise to an ongoing hostile work environment in her March 1, 2024, EEOC charge. (Doc. 15 at 11.) Plaintiff asserts that the Court, therefore, must consider any claims from 2023 forward. (*Id.*) Plaintiff's claim that her EEOC charge "properly complained of acts giving rise to an ongoing hostile work environment" is a legal conclusion, which the Court need not accept as true.

The EEOC charge was not provided to the Court, so the Court must rely on the *Complaint*'s factual allegations regarding the charge. The *Complaint* alleges the March 1, 2024, EEOC charge alleged "national origin harassment, retaliation and sex," but does not specify which of

Defendant's actions were included as the basis for her charge. (Doc. 1 at ¶ 33.) The *Complaint* never claims the EEOC charge included allegations of a hostile work environment.

An employee may file a civil action "not only upon the specific complaints made by the employee's initial EEOC charge, but also upon any kind of discrimination like or related to the charge's allegations, limited only by the scope of the EEOC investigation that could reasonably be expected to grow out of the initial charges of discrimination." Blanchard v. Tulane Univ., 636 F. Supp. 3d 642, 652 (E.D. La. 2022) (quoting Fellows v. Universal Rests., Inc., 701 F.2d 447, 451 (5th Cir. 1983)). "For a claim of hostile work environment to reasonably be expected to grow out of an employee's charge of discrimination, the employee must allege more than just discrete actions of discrimination." *Id.* at 653 (quoting *Trevino v. SAIA Motor Freight Line, LLC*, No. 4:20-cv-00825, 2021 WL 1009317, at *4 (N.D. Tex. Jan. 26, 2021)).

Defendant claims Plaintiff alleged she was not allowed to apply for the CEO position in March 2023, and that this allegation is untimely. (Doc. 11-1 at 6.) The Court, however, does not read this portion of the *Complaint* as an alleged discriminatory act because Plaintiff actually alleges that Plaintiff, Ms. Wade, and the staff were all unaware the CEO position was available. (Doc. 1 at ¶ 15.) Therefore, the Court reads paragraph 15 of the *Complaint* as background information, not an allegation of a Title VII violation.

The Court agrees with Defendant's assertion that Plaintiff's allegations regarding her two confrontations with Mr. Williams in April 2023 are time-barred. (Doc. 11-1 at 6.) The *Complaint* alleges that on April 18, 2023, Mr. Williams confronted Plaintiff about how he was listed on certain documents, and Mr. Williams eventually criticized Plaintiff's accent and mannerisms. (Doc. 1 at ¶ 18.) On April 28, 2023, Mr. Williams approached Plaintiff about their confrontation on April 18, 2023, and he questioned her about her OIG complaint. (*Id.* at ¶ 20.) Taking Plaintiff's factual

allegations as true, these two interactions appear to be discrete acts. It is unclear to the Court how these two acts are related to any acts occurring on or after May 6, 2023. *See Filer*, 690 F.3d at 647 (indicating a plaintiff must demonstrate that the separate acts are related for the continuing violation doctrine to apply). Based on the facts alleged in the *Complaint*, the Court finds that Plaintiff did not plausibly plead that the alleged unlawful employment practices occurring before May 6, 2023, were part of a hostile work environment. Accordingly, only conduct occurring on or after May 6, 2023, is actionable under Title VII. The Court, therefore, finds that all Title VII claims arising before May 6, 2023, are time-barred, and those claims will be dismissed.

### C.  Exhaustion of Count One's Title VII Claims Arising After March 1, 2024

#### 1.  *Parties' Arguments*

##### a.  *Motion to Dismiss* (Doc. 11)

Defendant notes that a private plaintiff must exhaust her administrative remedies by filing a Charge of Discrimination with the EEOC and receiving a Notice of Right to Sue before asserting a Title VII claim in a lawsuit. (Doc. 11-1 at 6 (citing *Taylor v. Books A Million, Inc.*, 296 F.3d 376, 378–79 (5th Cir. 2002)); 42 U.S.C. § 2000e-5(f)(1).) Defendant alleges that an employee must file an additional or amended charge with the EEOC for discrete incidents of discrimination that occur after the initial Charge is filed to satisfy the exhaustion requirement for these subsequent incidents. (*Id.* at 7.)

Defendant again asserts that Plaintiff filed her EEOC Charge on March 1, 2024. (*Id.*) Defendant claims Plaintiff did not file a new or amended charge regarding her allegations that she was demoted on September 13, 2024, and forced to resign on November 7, 2024. (*Id.*) Defendant further claims that Plaintiff did not resign until after the EEOC issued its Notice of Right to Sue.

(*Id.* (citing Doc. 1-2).) Therefore, argues Defendant, Plaintiff's claims about her alleged demotion and resignation have not been presented to the EEOC and are premature. (*Id.*)

b. *Opposition* (Doc. 15)

Plaintiff responds that she submitted an EEOC Charge for "national origin harassment, retaliation and sex" on March 1, 2024. (Doc. 15 at 11.) Plaintiff claims, "These actions constituted protected activity." (*Id.*) She continues that she "was forced to resign on November 7, 2024 due to her demotion and ongoing harassment in September, 2024." (*Id.*) "The court will find a claim is exhausted only when it could 'reasonably be expected to grow out of the charge of discrimination.'" (*Id.* at 12 (quoting *Sanchez v. Standard Brands, Inc.*, 431 F.2d 455, 465 (5th Cir. 1970)).) Plaintiff alleges her demotion and resignation "were part of the scope of the EEOC's investigation and attempted discussions with the Defendant." (*Id.*)

Plaintiff claims that on July 30, 2024, during the EEOC investigation, she informed the EEOC that she may be planning to resign because the alleged harassment was causing health issues for her (*Id.* at 13.) In September 2024, before the investigation was closed, Plaintiff allegedly informed the EEOC that she was being demoted/receiving a salary change. (*Id.*) Plaintiff claims the EEOC did not tell her that she needed to amend her Charge or open a new one when she allegedly disclosed this new information. (*Id.*) Plaintiff continues that her EEOC Charge includes a complaint about her salary, including Defendant's failure to approve her raise while she was COO and paying her four months late while she was interim CEO. (*Id.* (quoting *EEOC Charge for Estelle Pullen*, Doc. 15-3).[1])

Furthermore, argues Plaintiff, the parties agree that the scope of the lawsuit "extends no further than the scope of the investigation that can reasonably be expected to grow out of the charge

---

[1] Exhibit 3 to Document 15 was not filed into the record.

of discrimination." (*Id.* at 14 (citing *Fine v. GAF Chem. Corp.*, 995 F.2d 576, 577–78 (5th Cir. 1993)).) Plaintiff alleges that her intent to resign and her demotion both occurred during the EEOC's investigation and prior to the Notice of Right to Sue. (*Id.*) Plaintiff insists that she did not need to file a new or amended charge regarding these incidents because they were addressed in the investigation, grew out of the charges, and were addressed during the EEOC investigation. (*Id.*) Plaintiff concludes that her demotion and resignation allegations have been presented to the EEOC and are not premature. (*Id.*)

c. *Reply* (Doc. 18)

Defendant replies that Plaintiff's alleged constructive discharge, i.e., her resignation, did not occur until November 7, 2024, which was three days after the EEOC issued its Notice of Right to Sue. (Doc. 18 at 3.) Defendant alleges the EEOC's investigation had already concluded when Plaintiff resigned. (*Id.*) Defendant continues that the EEOC's investigation "did not cover the alleged constructive discharge and could not have been expected to grow out of the Charge." (*Id.* (citing *Sapp v. Potter*, 413 F. App'x 750, 752–53 (5th Cir. 2011); *Foster v. Texas Health Sys.*, 3:99-CV-1217, 2002 WL 1461737, at *6 (N.D. Tex. June 30, 2002)).) Constructive discharge, Defendant argues, "is a discrete act that must be specifically included in, or added to, the EEOC charge." (*Id.* (citing *Phillips v. Caris Life Scis., Inc.*, 715 F. App'x 365, 369 (5th Cir. 2017)).) Defendant concludes that Plaintiff's constructive discharge claim is unexhausted. (*Id.*)

Defendant also claims that Plaintiff's alleged demotion occurred on September 13, 2024, after she filed her Charge on March 1, 2024. (*Id.* at 3–4.) Defendant alleges Plaintiff was serving as interim CEO and had applied for the permanent CEO position when she filed her EEOC Charge on March 1, 2024. (*Id.* at 4.) Defendant subsequently hired a candidate for the permanent CEO role while Plaintiff was on leave from work. (*Id.*) Defendant alleges Plaintiff was advised that she

24

would resume her role as COO, which she had held before being appointed as interim CEO. (*Id.*) Defendant asserts that moving Plaintiff back to the role of COO "cannot reasonably be characterized as a 'demotion.'" (*Id.*) Furthermore, the alleged demotion occurred after Plaintiff filed her EEOC Charge and therefore falls outside the scope of the claims asserted in the Charge. (*Id.*) Defendant concludes the alleged demotion is not properly before the Court. (*Id.*)

### 2. *Applicable Law*

"A plaintiff asserting a claim under Title VII must exhaust administrative remedies before pursuing the claim in district court." *Bracken v. Welborn*, No. 20-72, 2021 WL 237693, at *4 (M.D. La. Jan. 25, 2021) (Dick, C.J.) (citing *Taylor*, 296 F.3d at 378–79; *Davis v. Fort Bend Cty.*, 893 F.3d 300, 303 (5th Cir. 2018) (citing 42 U.S.C. § 2000e–5(e)(1))). Administrative exhaustion occurs when a plaintiff files a timely charge with the EEOC and subsequently receives from the EEOC a statutory notice of the right to sue the employer named in the charge. *Id.* (citations omitted); 42 U.S.C. § 2000e–5(e)(1). Thereafter, the plaintiff has ninety days from receipt of the right-to-sue notice to file an action in court. *Taylor*, 296 F.3d at 379 (citations omitted).

For administrative exhaustion, it is not only important that the EEOC charge is filed in a timely manner; it is equally important that the charge covers the claims now forming the basis of the plaintiff's lawsuit, as "a primary purpose of Title VII is to trigger the investigatory and conciliatory procedures of the EEOC, in [an] attempt to achieve non-judicial resolution of employment discrimination claims." *Pacheco v. Mineta*, 448 F.3d 783, 788–89 (5th Cir. 2006) (citing *Sanchez*, 431 F.2d at 466). "Because a plaintiff's Title VII claim must be administratively exhausted, a subsequent suit must be limited to the claims made in the employee's initial EEOC charge or any type of discrimination 'like or related to the charge's allegations, limited only by the scope of the EEOC investigation that could reasonably be expected to grow out of the initial

charges of discrimination.'" *Bracken*, 2021 WL 237693, at *4 (citations omitted). The Fifth Circuit "interprets what is properly embraced in review of a Title–VII claim somewhat broadly, not solely by the scope of the administrative charge itself, but by the scope of the EEOC investigation which 'can reasonably be expected to grow out of the charge of discrimination.'" *Pacheco*, 448 F.3d at 789 (quoting *Sanchez*, 431 F.2d at 466); *see McClain v. Lufkin Indus., Inc.*, 519 F.3d 264, 274–75 (5th Cir. 2008) (explaining that "the 'scope' of the judicial complaint is limited to the 'scope' of the EEOC investigation which can reasonably be expected to grow out of the charge of discrimination.").

Discrete acts that arise after the EEOC charge was filed must be included in a supplemental or amended charge for claims arising from those acts to be exhausted. *Phillips*, 715 F. App'x at 369. Examples of discrete acts include termination, failure to promote, denial of transfer, refusal to hire, and resignation. *Nat'l R.R. Passenger Corp*, 536 U.S. at 114. *See Ayonride v. Team Indus. Servs. Inc.*, 121 F.4th 500, 509 (5th Cir. 2024) (concluding a plaintiff failed to exhaust administrative remedies when he made no reference to his resignation in either of his EEOC charges); *Green v. Brennan*, 578 U.S. 547, 568 (2016) (Alito, J., concurring) (stating an employee's resignation was a discrete act).

### 3. Analysis

At issue is whether Plaintiff properly exhausted her Title VII claims for events occurring after March 1, 2024, by filing an EEOC Charge on those claims. Defendant argues that actions occurring after the date Plaintiff's EEOC Charge was filed are not actionable under Title VII because (a) filing an EEOC Charge is a prerequisite to having an actionable claim, and (b) no EEOC Charge based on those acts was ever filed. (Doc. 11-1 at 6–7.) In short, the Court agrees with Defendant's position.

Plaintiff did not attach the EEOC Charge to the *Complaint*, so again the Court must rely on the factual allegations in the *Complaint* to apply the exhaustion analysis. Plaintiff attempts to introduce new factual allegations through her *Opposition* (Doc. 15), but the Court may not consider those allegations at the motion to dismiss phase. *See Inclusive Cmtys. Project, Inc.*, 920 F.3d at 900 (stating that when ruling on a Rule 12(b)(6) motion, a court may rely on the facts in the complaint, the documents attached thereto, and matter of which the court may take judicial notice). Nothing in the *Complaint* indicates that Plaintiff informed the EEOC about her September 13, 2024, demotion or her plan to resign from her position, which resignation occurred on November 7, 2024. (Doc. 1 at ¶¶ 35–37.) Additionally, there are no allegations suggesting that Plaintiff filed a new or amended EEOC Charge reporting that later conduct.

Based on the facts alleged in the *Complaint*, Plaintiff has not sufficiently pled enough factual matter to support an inference that the scope of the EEOC investigation on Plaintiff's charge could have included events occurring after the Charge was filed. "A necessary prerequisite to exhausting administrative remedies is having begun the administrative process." *Sapp v. Potter*, 413 F. App'x 750, 752 (5th Cir. 2011). The EEOC issued its Notice of Right to Sue on November 4, 2024. (Doc. 1-2.) Therefore, the investigation had already concluded when Plaintiff resigned on November 7, 2024. (Doc. 1 at ¶ 37.) A person cannot reasonably expect a concluded investigation to include an event that has not yet occurred. Therefore, as to the claims that Defendant violated Title VII based on conduct occurring after March 1, 2024, Plaintiff has not exhausted her administrative remedies. Accordingly, the Court finds that all Title VII claims arising after March 1, 2024, are not actionable due to Plaintiff's failure to exhaust administrative remedies, and those claims will be dismissed.

### D. Count One's Louisiana Law Claim

#### 1. *Parties' Arguments*

Defendant argues it is exempt from Plaintiff's state law employment discrimination claim because it is a nonprofit organization that is specifically exempted under Louisiana Revised Statutes 23:302(2)(b). (Doc. 11-1 at 7–8.) Defendant claims Plaintiff has judicially admitted that Defendant is a nonprofit entity. (*Id.* at 8 (citing Doc. 1 at ¶ 8).) Defendant further asserts that the state law employment discrimination claim has prescribed because the one-year prescriptive period (1) began to run on April 26, 2023, at the latest; (2) was suspended after 310 days when the EEOC Charge was filed on March 1, 2024; (3) remained suspended for six months, at maximum, during the administrative review; (4) began to run again on September 1, 2024, with 55 days remaining; and (5) ended on or about October 26, 2024. (*Id.* at 8–9.) Defendant concludes that Plaintiff's state law claim had prescribed by the time she filed this lawsuit on January 15, 2025. (*Id.* at 9.)

In her *Opposition*, Plaintiff withdraws her Louisiana Employment Discrimination Law cause of action. (Doc. 15 at 14.)

#### 2. *Applicable Law & Analysis*

In Count One of her *Complaint*, Plaintiff alleges state, as well as federal, employment discrimination claims, asserting the state law claims under the Louisiana Employment Discrimination Law, Louisiana Revised Statutes 23:301, *et seq.* (Doc. 1 at ¶ 39.) This law, however, specifically states that it "shall not apply to" the employment of an individual by "any nonprofit corporation." La. R.S. 23:302(2)(b). The *Complaint* alleges, and Defendant concurs, that Defendant is a nonprofit corporation. (Doc. 1 at ¶ 8, Doc. 11-1 at 8.) The Court agrees with Defendant that Plaintiff may not bring a claim against Defendant under the Louisiana Employment Discrimination Law because the plain language of the statute specifically precludes such an action.

Additionally, Plaintiff did not oppose this portion of the motion to dismiss and instead attempted to withdraw her state law claim. Accordingly, the motion will be granted as to the state law employment discrimination claim, and that claim will be dismissed.

### E.  Count Two's Discrimination Claim Under § 1981

#### 1.  Parties' Arguments

##### a.  *Motion to Dismiss* (Doc. 11)

Defendant alleges that for the § 1981 claim, the *Complaint* must "plead allegations that plausibly show that, but for racial animus in the form of national origin discrimination," Defendant would have hired Plaintiff as CEO. (Doc. 11-1 at 10 (citing *Comcast Corp. v. National Ass'n of Afr. Am.-Owned Media*, 589 U.S. 327, 331 (2020).) Defendant then asserts that the *Complaint* "has not alleged facts establishing that, but-for a discrimination against her nationality and accent, [Plaintiff] would have been hired as the CEO of St. Gabriel." (*Id.*)

Defendant acknowledges that the *Complaint* makes factual allegations regarding comments about Plaintiff's accent. (*Id.*) Defendant, however, claims the *Complaint* lacks allegations that draw a connection between the alleged comments and Defendant's decision not to hire Plaintiff as CEO. (*Id.*) Defendant contends that the *Complaint*'s assertion that "'Plaintiff was not hired due to her accent'" is a conclusory statement aimed at "establishing an element that the factual allegations do not otherwise establish." (*Id.* (quoting Doc. 1 at ¶ 44).) Without this "conclusory statement," the *Complaint* "lacks any factual allegations to show that but-for an alleged animus toward her nationality," Defendant would have hired Plaintiff as CEO. (*Id.*) Defendant further contends that Plaintiff fails to connect the alleged comments about her accent to her alleged demotion. (*Id.*) Defendant concludes that the *Complaint* lacks factual allegations to establish a § 1981 claim and that the claim should be dismissed. (*Id.*)

### b. *Opposition* (Doc. 15)

Plaintiff counters that the *Complaint*'s factual allegations do connect the "but-for" cause, the alleged national origin discrimination, to the failure to hire and the demotion. (Doc. 15 at 15.) Plaintiff points to allegations in the *Complaint*, such as the assertion that "Board members stated that they would not make the Plaintiff CEO because of her accent." (*Id.* at 15–16 (quoting Doc. 1 at 7–8).) Plaintiff asserts that the *Complaint* specifically alleges discriminatory animus in its recounting of an April 26, 2023, meeting with members of Defendant's Board of Directors wherein members discussed Plaintiff's accent. (*Id.* at 16.) Plaintiff then claims that the same Board chose not to hire Plaintiff despite the successful candidate allegedly being less qualified than Plaintiff and having more complaints lodged against him than Plaintiff did. (*Id.*) Plaintiff goes on to argue the Board discussed her African background and thick accent three months later and then told Plaintiff she was not hired because she had an accent. (*Id.*)

According to Plaintiff, these allegations about "the Board's discriminatory statements about her African origin and accent" show Defendant's intent and are the reason Plaintiff was not hired as CEO. (*Id.*) Plaintiff claims she would have been hired as CEO if she did not have an accent and appeared "American." (*Id.*)

### c. *Reply* (Doc. 18)

Defendant replies that Plaintiff must plausibly allege the adverse employment action would not have occurred but for racial animus. (Doc. 18 at 4 (citing *Comcast Corp.*, 589 U.S. at 331, 341).) Defendant claims Plaintiff fails to allege "she was discriminated against based on her race." (*Id.*) According to Defendant, the *Complaint* focuses on Plaintiff's nationality and accent, without alleging any facts showing that racial animus, as opposed to national origin bias, was the but-for cause of the employment decisions at issue." (*Id.*) Defendant insists Plaintiff "fails to establish any

connection between race and the employment action." (*Id.*) Defendant also alleges that the *Complaint* lacks facts linking comments about Plaintiff's accent to her removal from the interim CEO position. (*Id.*) Defendant concludes, "Because the Complaint fails to allege that Ms. Pullen was treated adversely *because of race*, as required under *Comcast*, her Section 1981 claim must be dismissed." (*Id.* (emphasis in original).)

### 2. *Applicable Law*

To establish a § 1981 claim, Plaintiff must allege that "(1) they are members of a racial minority; (2) Defendants intended to discriminate on the basis of race; and (3) the discrimination concerned one or more of the activities enumerated in the statute." *Body by Cook, Inc. v. State Farm Mut. Auto. Ins.*, 869 F.3d 381, 386 (5th Cir. 2017). "Section 1981 claims are only available for discrimination based on race." *Pisharodi v. Valley Baptist Med. Ctr.*, 393 F. Supp. 2d 561, 574 (S.D. Tex. 2005) (listing cases in support). Plaintiffs can show discrimination through disparate treatment or disparate impact. *Abdallah v. Mesa Air Grp, Inc.*, 83 F.4th 1006, 1013 (5th Cir. 2023). Disparate treatment involves actions that treat a plaintiff worse than others based on a protected characteristic. *Id.* "Disparate impact involves 'practices or policies that are facially neutral in their treatment of these protected groups, but, in fact, have a disproportionately adverse effect on such a protected group.'" *Id.* Plaintiff's *Complaint* appears to allege disparate treatment. "The 'simple test' for determining whether disparate treatment has occurred is 'whether the evidence shows treatment of a person in a manner which but-for that person's [protected characteristic] would be different.'" *Id.* at 1014 (brackets in original) (quoting *City of L.A., Dep't of Water & Power v. Manhart*, 435 U.S. 702, 711 (1978)).

### 3.  Analysis

Defendant's argument is that Plaintiff has not shown but for the animus toward her nationality, she would have been hired as CEO. (Doc. 11-1 at 9–10.) This argument, however, does not utilize the correct standard. For a § 1981 claim, a Plaintiff must plead racial discrimination, not national origin discrimination. *See Pisharodi*, 393 F. Supp. 2d at 575 ("National origin discrimination is not racial discrimination."). On reply, Defendant argues for the first time that Plaintiff fails to allege she was discriminated against based on race, which is the correct standard for § 1981. (Doc. 18 at 4.)

"It is the practice of [the Fifth Circuit] and the district courts to refuse to consider arguments raised for the first time in reply briefs." *Williams v. E.I. du Pont de Nemours & Co.*, 154 F. Supp. 3d 407, 410 n.1 (M.D. La. 2015) (quoting *Gillaspy v. Dallas Indep. Sch. Dist.*, 278 F. App'x 307, 315 (5th Cir. 2008)). However, the Court has discretion to consider new arguments raised in the reply depending on the circumstances of the case. *See Sam v. Byrd*, No. 23-1485, 2025 WL 3144744, at *4 (M.D. La. Nov. 10, 2025) (deGravelles, J.) (declining to strike new evidence raised on reply primarily because it was not prejudicial and would make no difference to the outcome of the case); *Elwakin v. Target Media Partners Operating Co. LLC*, 901 F. Supp. 2d 730, 745–46 (E.D. La. 2012) (striking new evidence raised on reply because the proffered reason for providing the new evidence was questionable and the introduction of the evidence was not the result of excusable oversight). Defendant has provided no reason why it chose to raise a new argument on reply, so the Court cannot find the inclusion of the new argument was a case of excusable oversight. Additionally, without this newly raised argument, which applies the correct standard for § 1981 claims, the Court will deny the motion, as explained below. However, if the Court considers Defendant's new argument, the motion will be granted. Thus, considering the new argument would

affect the outcome of the motion, and it would prejudice Plaintiff by leading to the dismissal of her § 1981 claim. Therefore, the Court will not consider the new argument in the *Reply*.

"[T]he movant has the burden to show dismissal is warranted under Rule 12(b)(6)." *Cantu v. Guerra*, No. SA-20-CV-0746, 2021 WL 2636017, at *1 (W.D. Tex. June 25, 2021) (citing *Ehiemua-Wiggins v. Napolitano*, No. H-09-2286, 2010 WL 519704, at *1 (S.D. Tex. Feb. 8, 2010)). Because Defendant incorrectly argues that Plaintiff's claims must be dismissed due to a failure to show but-for causation linked to national origin discrimination, Defendant has not carried its burden under Rule 12(b)(6), and the motion must be denied as to the § 1981 claim.

### F.  Count Three's Whistleblower Claim

#### 1.  *Parties' Arguments*

##### a.  <u>*Motion to Dismiss*</u> (Doc. 11)

Defendant notes, "An individual who believes she is the victim of a reprisal has recourse under § 4712, and must exhaust administrative remedies before seeking relief in federal court." (Doc. 11-1 at 11.) To satisfy the exhaustion requirement, a plaintiff must have filed a complaint with the relevant federal agency's OIG within three years of the alleged retaliatory action. (*Id.* (citing 41 U.S.C. § 4712(b)(1)).) After the complaint's filing, the whistleblower may file a lawsuit for relief either within 210 days of the complaint's filing if the agency fails to issue a decision or within 30 days after the agency issues a decision. (*Id.* (citing §4712(c)(2)).)

Defendant initially argues that Plaintiff's whistleblower claim is premature for failure to exhaust administrative remedies. (*Id.*) Plaintiff's *Complaint* allegedly "lacks any support to confirm she submitted a complaint *of retaliation* to the OIG as required." (*Id.* (emphasis in original.) Defendant alleges that Plaintiff makes "an overly broad conclusory allegation without any facts supporting the allegation" when she asserted that she complied with all prerequisites

under § 4712 and that 210 days have passed since she filed her whistleblower complaint. (*Id.* (citing Doc. 1 at 2).) Defendant complains that Plaintiff's allegation does not state when Plaintiff's retaliation complaint was filed and could be read as a reference to her original March 20, 2023, complaint rather than a subsequent retaliation complaint. (*Id.* at 11–12.) Defendant surmises that without "clear factual allegations in the Complaint that confirm Ms. Pullen is entitled to pursue a claim of retaliation," Plaintiff's whistleblower claim must be dismissed for failure to exhaust administrative remedies. (*Id.* at 12.)

Defendant also argues the *Complaint* lacks factual allegations to support a retaliation claim. (*Id.*) The *Complaint* alleges that Mr. Williams's concern regarding Plaintiff's March 20, 2023, OIG complaint led Mr. Williams to influence Plaintiff's demotion and pay cut as well as Plaintiff being passed over for the CEO position. (*Id.* (quoting Doc. 1 at 10).) Defendant claims this allegation is an entirely conclusory and speculative assertion with no factual basis to support Plaintiff's retaliation claim, and it, therefore, must be dismissed. (*Id.*)

### b. *Opposition* (Doc. 15)

Plaintiff responds that 41 U.S.C. § 4712 "does not require any specific form or substance of the complaint." (Doc. 15 at 17.) Plaintiff argues that to prevail on a § 4712 claim, a plaintiff must establish "(1) she was an employee of a government contractor," "(2) she disclosed information that she reasonably believed was evidence of a rule violation related to a federal contract to the required person," and "(3) her disclosure was a contributing factor in the action taken against her." (*Id.* (quoting *Wykosky v. ATCS, PLLC*, No. 22-cv-01881, 2023 WL 4547992, at *3 (D.D.C. July 14, 2023)).)

Plaintiff claims her *Complaint* sufficiently alleges that she submitted an OIG complaint and that Defendant knew that Plaintiff engaged in a protected activity. (*Id.* at 18.) Plaintiff notes

that the *Complaint* alleges Mr. Williams demanded to know what Plaintiff's complaint was about and showed her a copy of the OIG special agent's business card. (*Id.*) Plaintiff also specifically references the *Complaint*'s allegation that Mr. Williams influenced Plaintiff's demotion, pay cut, and failure to be named CEO due to Mr. Williams's concern about the OIG complaint. (*Id.*) Plaintiff argues § 4712 should be construed broadly to protect whistleblowers because it is a remedial statute. (*Id.*) Plaintiff alleges her disclosures to the OIG regarding alleged misconduct in the handling of federal funds "falls squarely within the scope of protected activity envisioned by the statute." (*Id.*)

Plaintiff additionally argues that Defendant does not clearly support its contention that Plaintiff's retaliation allegations are speculative. (*Id.* at 19.) Plaintiff again points to her allegation that Mr. Williams influenced the alleged adverse employment actions taken against her. (*Id.*) Plaintiff insists that Defendant's disagreement with a factual allegation does not mean she lacks a cause of action. (*Id.*) She also claims the *Complaint* "specifically indicates that there is a temporal and factual causal connection between OIG complaint and Ms. Pullen's rejection as CEO." (*Id.*) Plaintiff argues there are sufficient factual allegations to support a § 4712 claim. (*Id.*)

c. *Reply* (Doc. 18)

In reply, Defendant argues that "Plaintiff does not dispute that she failed to exhaust administrative remedies, but instead incorrectly argues that exhaustion is not required under 42 U.S.C. § 4712 (c)(2)." (Doc. 18 at 5.) Defendant maintains that binding precedent and the statute's plain language require exhaustion of administrative remedies before suing under § 4712. (*Id.* (citing *Robertson v. Intratek Comput., Inc.*, 976 F.3d 575, 580 (5th Cir. 2020); *Wright v. Common Ground Health Clinic, Inc.*, No. 16-11623, 2016 WL 4720011, at *4 (E.D. La. Sept. 9, 2016)).) Defendant argues the only reasonable interpretation of § 4712(c)(2) is that administrative

exhaustion is required. (*Id.* (citing *Wright*, 2016 WL 4720011, at *4).) Defendant concludes that by Plaintiff's own admission, the whistleblower claim in the *Complaint* has not been exhausted. (*Id.*)

### 2. *Applicable Law*

Plaintiff's whistleblower claims in Count Three arise under the National Defense Authorization Act of 2013, 41 U.S.C. § 4712, which "prohibits any recipient of federal dollars from retaliating against whistleblowers who report an abuse of that money." *Texas Educ. Agency v. U.S. Dep't of Educ.*, 992 F.3d 350, 353 (5th Cir. 2021). This statute "provides a private right of action to employees of federal contractors who are discharged or discriminated against in retaliation for disclosing information about regulatory violations to a federal entity responsible for overseeing the employer's federal contract." *Wright*, 2016 WL 4720011, at *3.

Section 4712(a)(1) provides:

An employee of a contractor . . . may not be discharged, demoted, or otherwise discriminated against as a reprisal for disclosing . . . information that the employee reasonably believes is evidence of gross mismanagement of a Federal contract or grant, a gross waste of Federal funds, an abuse of authority relating to a Federal contract or grant, a substantial and specific danger to public health or safety, or a violation of law, rule, or regulation related to a Federal contract (including the competition for or negotiation of a contract) or grant.

Section 4712 "creates an administrative apparatus to review whistleblowers' complaints and to afford them administrative remedies." *Robertson*, 976 F.3d at 580 (citing 41 U.S.C. § 4712(b)). Binding precedent dictates that a plaintiff must exhaust her administrative remedies before suing under § 4712. *Id.* (citing § 4712(b), (c)(1)). "[A]dministrative remedies are exhausted when the agency acts or fails to act for specified time periods." *Id.* (citing § 4712(c)(2)). Specifically,

If the head of an executive agency issues an order denying relief under [(c)](1) or has not issued an order within 210 days after the submission of a complaint under

36

subsection (b), or in the case of an extension of time under paragraph (b)(2)(B), not later than 30 days after the expiration of the extension of time, and there is no showing that such delay is due to the bad faith of the complainant, the complainant shall be deemed to have exhausted all administrative remedies with respect to the complaint, and the complainant may bring a de novo action at law or equity against the contractor, subcontractor, grantee, subgrantee, or personal services contractor to seek compensatory damages and other relief available under this section in the appropriate district court of the United States, which shall have jurisdiction over such an action without regard to the amount in controversy. Such an action shall, at the request of either party to the action, be tried by the court with a jury. An action under this paragraph may not be brought more than two years after the date on which remedies are deemed to have been exhausted.

41 U.S.C. § 4712(c)(2).

### 3. *Analysis*

Defendant's argument is twofold: (1) Plaintiff's *Complaint* "lacks any support to confirm she submitted a complaint *of retaliation* to the OIG as required" and (2) the *Complaint* "lacks factual allegations to support [Plaintiff's] claim of retaliation." (Doc. 11-1 at 11–12.)

In support of the first argument, Defendant asserts that the *Complaint* does not state when Plaintiff's retaliation complaint was filed and could be read as a reference to her original March 20, 2023, complaint rather than a subsequent retaliation complaint. (*Id.* at 11–12.) Defendant claims that the *Complaint* must allege clear factual allegations that "confirm" Plaintiff is entitled to pursue her retaliation claim. (*Id.* at 12.)

At the pleading stage, however, Plaintiff need not "prove" or "confirm" her allegations; she need only state a legally cognizable claim that is plausible. *See Covington Cnty. Sch. Dist. ex rel. Keys*, 675 F.3d at 854 (stating the Court's task on a Rule 12(b)(6) motion is "to determine whether the plaintiff has stated a legally cognizable claim that is plausible, not to evaluate the plaintiff's likelihood of success").When read in the light most favorable to the Plaintiff, the *Complaint* does allege that Plaintiff lodged a whistleblower complaint with the OIG. Specifically, the *Complaint* alleges, "210 days have passed since the lodging of the whistleblower complaint

with the Office of Inspection [sic] General of the U.S. Department of Health and HumanServices [sic]." (Doc. 1 at ¶ 4.) The Court interprets this allegation, not as a reference to Plaintiff's initial complaint to the OIG regarding the alleged abuse of federal funds (Doc. 1 at ¶ 17), but as an allegation that a subsequent complaint was lodged in which Plaintiff alleged whistleblower retaliation. Therefore, Plaintiff has plausibly pled that she exhausted her administrative remedies for her § 4712 claim.

Defendant also argues that the *Complaint* does not contain enough factual allegations to support a claim of retaliation. (Doc. 11-1 at 12.) In opposition, Plaintiff points to the *Complaint*'s allegations that Mr. Williams confronted Plaintiff about her OIG complaint regarding the alleged abuse of federal funds. (Doc. 15 at 18.) During this confrontation, Mr. Willaims allegedly "adamantly questioned" Plaintiff about her complaint and "tried to force Plaintiff to answer detailed questions about the complaint." (Doc. 1 at ¶ 20.) Plaintiff's *Opposition*, also specifically references the *Complaint*'s allegation that Mr. Williams influenced Plaintiff's demotion, pay cut, and denial of the CEO position because Mr. Williams was concerned about the OIG complaint. (Doc. 15 at 18.) Defendant asserts that the latter allegation is entirely conclusory and a speculative assertion with no factual basis. (Doc. 11-1 at 12.)

Plaintiff's factual allegations, if true, establish that she filed a complaint with the OIG regarding the alleged abuse and misuse of federal funds (Doc. 1 at ¶ 17), that Defendant's CEO Mr. Williams confronted and adamantly questioned Plaintiff about the OIG complaint (*Id.* at ¶ 20), that Mr. Williams disagreed with the Board's decision not to reprimand Plaintiff regarding this confrontation (*Id.* at ¶ 23), and that Mr. Williams influenced the implementation of alleged adverse employment action against Plaintiff due to his concerns about the OIG complaint (*Id.* at ¶ 49). The alleged adverse employment actions included demoting Plaintiff and cutting her pay as well as

passing Plaintiff over for the position of CEO. (*Id.*) These factual allegations, when taken as true and viewed in the light most favorable to Plaintiff, indicate that Mr. Williams, the CEO of Plaintiff's employer (Defendant), was concerned about Plaintiff's OIG complaint; attempted to get Plaintiff to divulge information about the complaint, and when she refused, wanted Plaintiff to be reprimanded; and influenced Plaintiff being passed over for the CEO position, demoted, and paid a lower salary because Plaintiff filed an OIG complaint. Section 4712(a)(1) prohibits the discharge, demotion, or other discrimination against an employee as a reprisal for disclosing information that the employee reasonably believes is evidence of, among other things, gross mismanagement of a Federal contract or grant or a gross waste of Federal funds. Based on the facts alleged in the *Complaint*, Plaintiff has stated enough facts to plead a plausible whistleblower claim pursuant to 41 U.S.C. § 4712, and the motion to dismiss is denied as to this claim.

### G. Count Four—Request for Damages

#### 1. Parties' Arguments

##### a. Motion to Dismiss (Doc. 11)

Defendant argues that Plaintiff's "Fourth Cause of Action" is actually a request for Title VII damages, not a cause of action. (Doc. 11-1 at 12.) Defendant asserts that for the reasons explained earlier in its motion, "Plaintiff's Title VII claims are untimely, unsupported, or premature." (*Id.*) Defendant concludes that Plaintiff's request for Title VII damages "cannot stand." (*Id.*)

##### b. Opposition (Doc. 15)

Plaintiff agrees that the "Fourth Cause of Action" is not an independent cause of action. (Doc. 15 at 19.) She alleges the inclusion of the words "Fourth Cause of Action" in the title of that portion of the *Complaint* was a mistake, and the label should have read "COMPENSATORY AND

PUNITIVE DAMAGES UNDER TITLE VII ARE ALLOWED." (*Id.*) Plaintiff insists that the allegations should stand because she is entitled to damages if she prevails on her claims. (*Id.*)

### 2. *Analysis*

Plaintiff has admitted that her request for damages was mislabeled as a cause of action. The Court sees no reason to dismiss this portion of the *Complaint* solely because it was mislabeled. Additionally, Defendant's argument for the dismissal of the request for damages is unpersuasive. Defendant claims this portion of the *Complaint* should be dismissed because Defendant's arguments in earlier portions of its motion to dismiss establish that Plaintiff's Title VII claims "are untimely, unsupported, or premature." (Doc. 11-1 at 12.) However, Defendant's motion only sought, and the Court only granted, dismissal of Plaintiff's Title VII claims arising before May 6, 2023, and after March 1, 2024. (Doc. 11-1 at 5–7.) Plaintiff's other allegations in support of her Title VII claim remain. Furthermore, Plaintiff's request for damages also seeks damages under § 1981, which Defendant does not address in its motion. Thus, Defendant has not carried its burden as the movant to establish grounds for dismissal of Plaintiff's request for damages.

## IV.   LEAVE TO AMEND

Plaintiff requests the opportunity to amend if the Court grants the *Motion to Dismiss*. (Doc. 15 at 4.) Plaintiff asserts that Rule 15(a) of the Federal Rules of Civil Procedure "evinces a bias in favor of granting leave to amend." (*Id.* at 4, n.2 (quoting *Dussouy v. Gulf Coast Inv. Corp*, 660 F.2d 594, 597–98 (5th Cir. 1981)).)

Rule 15(a) "requires a trial court to grant leave to amend freely, and the language of this rule evinces a bias in favor of granting leave to amend." *Jones v. Robinson Prop. Grp., L.P.*, 427 F.3d 987, 994 (5th Cir. 2005) (cleaned up). However, "[l]eave to amend is in no way automatic." *Marucci Sports, L.L.C. v. National Collegiate Athletic Ass'n*, 751 F.3d 368, 378 (5th Cir. 2014)

(citing *Jones*, 427 F.3d at 994). The Court can deny a party's request for leave to amend if it has a "substantial reason" for doing so. *Id.* The Fifth Circuit has further described a district court's discretion on a motion to amend as follows:

> The district court is entrusted with the discretion to grant or deny a motion to amend and may consider a variety of factors including "undue delay, bad faith or dilatory motive on the part of the movant, repeated failures to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party ..., and futility of the amendment." [*Jones*, 427 F.3d at 994] (citation omitted). "In light of the presumption in favor of allowing pleading amendments, courts of appeals routinely hold that a district court's failure to provide an adequate explanation to support its denial of leave to amend justifies reversal." *Mayeaux v. La. Health Serv. and Indent. Co.*, 376 F.3d 420, 426 (5th Cir. 2004) (citation omitted). However, when the justification for the denial is "readily apparent," a failure to explain "is unfortunate but not fatal to affirmance if the record reflects ample and obvious grounds for denying leave to amend." *Id.* (citation and internal quotation marks omitted).

*Id.*

In addition, the Fifth Circuit has made clear that "[d]enying a motion to amend is not an abuse of discretion if allowing an amendment would be futile." *Id.* (citing *Briggs v. Mississippi*, 331 F.3d 499, 508 (5th Cir. 2003)). An amendment is futile "if it would fail to survive a Rule 12(b)(6) motion." *Id.* (citing *Briggs*, 331 F.3d at 508).

Having carefully considered the matter, the Court will grant leave to amend. In its *Reply*, Defendant did not argue against granting leave. This is Plaintiff's first request for leave to amend the *Complaint*. Additionally, she requested leave to amend in response to allegations that her *Complaint* failed to state a valid claim (Doc. 15 at 4), so the Court sees no indication of bad faith or dilatory tactics. Further, the request was not unduly delayed, and Defendant has not argued that allowing amendment would prejudice it. Finally, amendment would not be futile but would instead provide Plaintiff an opportunity to correct the deficiencies in the *Complaint* that the Court noted earlier in this Ruling. Therefore, Plaintiff will be granted leave to amend her *Complaint*.

V.    CONCLUSION

Accordingly,

**IT IS ORDERED** that the *Rule 12 Motion to Strike Allegations and Dismiss Claims* (Doc. 11) filed by defendant St. Gabriel Health Clinic, Inc. is **GRANTED IN PART** and **DENIED IN PART**.

**IT IS FURTHER ORDERED** that the *Motion to Strike* is **DENIED**.

**IT IS FURTHER ORDERED** that the *Motion to Dismiss* is **GRANTED** as to Count One's Title VII claims arising before May 6, 2023, and after March 1, 2024, and Count One's state law claims. These claims will be dismissed without prejudice.

**IT IS FURTHER ORDERED** that the *Motion to Dismiss* is **DENIED** in all other respects.

**IT IS FURTHER ORDERED** that plaintiff Estelle Pullen's request for leave to amend the *Complaint* (Doc. 15 at 4) is **GRANTED**. Plaintiff will be given twenty-eight (28) days in which to amend her complaint to cure the deficiencies outlined in this ruling. Failure to do so will result in the dismissal of these claims with prejudice. If Plaintiff fails to file an amended complaint timely, Defendant should file a notice with the Court reflecting same.

Signed in Baton Rouge, Louisiana, on <u>February 23, 2026</u>.

**JUDGE JOHN W. deGRAVELLES**
**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF LOUISIANA**